# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| IN RE 2025 SUBPOENA TO CHILDREN'S NATIONAL HOSPITAL | Case No. 25-cv-03780-JRR |

## UNITED STATES' MEMORANDUM OF LAW
## IN OPPOSITION TO MOTION TO QUASH SUBPOENA

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iii

INTRODUCTION ........................................................................................................... 1

FACTUAL AND LEGAL BACKGROUND ...................................................................... 2

ARGUMENT .................................................................................................................. 5

    I.       Plaintiffs lack standing under 18 U.S.C. § 3486 to challenge the subpoena. ......... 5

    II.      Sovereign immunity principles independently foreclose Plaintiffs' action. ......... 10

    III.    Plaintiffs' motion is also time-barred. ................................................................ 11

    IV.   Congress anticipated and authorized subpoenas to obtain patient records. .......... 13

    V.      The subpoena satisfies the Fourth Amendment because it properly seeks evidence
          of adulterated, misbranded, and unapproved new drug violations of the FDCA.. 14

       A.    The subpoena properly seeks evidence of adulterated, misbranded, and
            unapproved new drug violations of the FDCA. .................................................... 14

    VI.   Plaintiffs' Fifth Amendment privacy claim collapses under the Fourth Circuit's
          controlling law .................................................................................................... 17

       A.    Plaintiffs' asserted privacy expectations are contrary to modern medical practice
            and the explicit disclosures in CNMC's Notice of Privacy Practices. .................. 18

       B.    The Fourth Circuit's decision in *In Re Subpoena Duces Tecum* dictates the result
            in this Circuit—not *Westinghouse*—and it confirms the subpoena's validity. ...... 21

    VII.  Any relief should be confined to the named Plaintiffs here and limited to
          modification of the subpoena. .............................................................................. 24

CONCLUSION ............................................................................................................... 26

# TABLE OF AUTHORITIES

**Cases**

*Am. Fed'n of Gov't Emps., AFL-CIO v. HUD*,
  118 F.3d 786 (D.C. Cir. 1997) ..................................................................... 10

*Bacto-Unidisk*,
  394 U.S. 784 (1969) .............................................................................. 2, 23

*Bryant v. City of Norfolk*,
  No. 2:20CV26, 2020 WL 14038704 (E.D. Va. Aug. 7, 2020) ................................ 21

*Bullock v. Napolitano*,
  666 F.3d 281 (4th Cir. 2012) ...................................................................... 10

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) ................................................................................. 25

*Cunningham v. Gen. Dynamics Info. Tech., Inc.*,
  888 F.3d 640 (4th Cir. 2018) ...................................................................... 11

*Dorsey v. United States*,
  618 F. Supp. 471 (D. Md. 1985) .................................................................. 11

*Esteras v. United States*,
  606 U.S. 185 (2025) ................................................................................... 7

*FDIC v. Meyer*,
  510 U.S. 471 (1994) ................................................................................. 10

*Gill v. Whitford*,
  585 U.S. 48 (2018) ................................................................................... 24

*Google LLC*,
  579 F. Supp. 3d 62 (D.D.C. 2021) ............................................................... 25

*In re Subpoena Duces Tecum*,
  228 F.3d 341 (4th Cir. 2000) ............................................................... passim

*In re Subpoenas Duces Tecum*,
  51 F. Supp. 2d 726 (W.D. Va. 1999) ............................................................ 18

*In re: Grand Jury 2021 Subpoenas*,
  87 F.4th 229 (4th Cir. 2023) ........................................................................ 9

*Jones v. Comm'r*, No. CIV A,
  CCB-07-2024, 2007 WL 4302593 (D. Md. Aug. 23, 2007) ................................ 12

*Lane v. Peña*,
  518 U.S. 187 (1996) ............................................................................................................ 11

*Lee v. City of Columbus*,
  636 F.3d 245 (6th Cir. 2011) ............................................................................................ 10

*M.J. v. District of Columbia*,
  No. 118CV01901EGSGMH, 2020 WL 13668559 (D.D.C. July 1, 2020) ............................ 25

*Mackey v. SEC*,
  No. 3:96MC407, 1997 WL 114801 (D. Conn. Feb. 21, 1997) ................................................ 6

*Maryland v. Craig*,
  497 U.S. 836 (1990) ............................................................................................................ 24

*NASA v. Nelson*,
  562 U.S. 134 (2011) ............................................................................................................ 10

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
  567 U.S. 519 (2012) ............................................................................................................ 13

*New York v. Ferber*,
  458 U.S. 747 (1982) ............................................................................................................ 23

*Osmon v. United States*,
  66 F.4th 144 (4th Cir. 2023) ............................................................................................ 10

*Payne v. Taslimi*,
  998 F.3d 648 (4th Cir. 2021) ................................................................................... 7, 10, 17

*Ponsford v. United States*,
  771 F.2d 1305 (9th Cir. 1985) ............................................................................................ 11

*Ponsford*,
  771 F.2d ............................................................................................................................. 11

*Prince v. Massachusetts*,
  321 U.S. 158 (1944) ............................................................................................................ 23

*Smith v. United States*,
  289 F.3d 843 (6th Cir. 2001) ............................................................................................ 14

*Swann v. Secretary, HUD*,
  No. 05-492, 2006 WL 148738 (D.D.C. Jan. 19, 2006) ........................................................ 12

*Trump v. CASA, Inc.*,
  606 U.S. 831 (2025) ............................................................................................................ 24

*Trump v. Hawaii*,
  585 U.S. 667 (2018) ............................................................................................................ 15

*Turner v. United States*,
   881 F. Supp. 449 (D. Haw. 1995)............................................................................. 12

*U.S. ex rel. Roberts v. QHG of Indiana, Inc.*,
   No. 1:97-CV-174, 1998 WL 1756728 (N.D. Ind. Oct. 8, 1998) ............................... 25

*United States v. Armstrong*,
   517 U.S. 456 (1996).................................................................................................. 16

*United States v. Chem. Found.*,
   272 U.S. 1 (1926)........................................................................................ 16, 17, 20

*United States v. Dotterweich*,
   320 U.S. 277 (1943)........................................................................................ 2, 15, 23

*United States v. Elliott*,
   676 F. Supp. 2d 431 (D. Md. 2009) .......................................................................... 21

*United States v. Idema*,
   118 F. App'x 740 (4th Cir. 2005) ................................................................................ 9

*United States v. LaSalle Nat'l Bank*,
   437 U.S. 298 (1978)............................................................................................ 14, 15

*United States v. Park*,
   421 U.S. 658 (1975)................................................................................................... 23

*United States v. Skrmetti*,
   145 S. Ct. 1816 (2025)............................................................................................... 16

*United States v. Westinghouse Electric Corporation*,
   638 F.2d 570 (3d Cir. 1980) ................................................................................ 18, 21

*United States v. Whispering Oaks Residential Care Facility, LLC*,
   673 F.3d 813 (8th Cir. 2012) ..................................................................................... 15

*Walls v. City of Petersburg*,
   895 F.2d 188 (4th Cir. 1990) ............................................................................... 10, 17

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338, (2011).................................................................................................. 24

*Warth v. Seldin*,
   422 U.S. 490 (1975)................................................................................................... 24

*Watson v. Lowcountry Red Cross*,
   974 F.2d 482 (4th Cir. 1992) ..................................................................................... 21

*Weinberger v. Hynson, Westcott & Dunning, Inc.*,
   412 U.S. 609 (1973)..................................................................................................... 4

*Whalen v. Roe*,
  429 U.S. 589 (1977) ........................................................................................... 9, 10, 22

**Statutes**

Health Insurance Portability and Accountablity Act, Pub. L. No. 104-191 ............................ 7, 13

5 U.S.C. § 552a ................................................................................................................... 21

12 U.S.C. § 3410 .................................................................................................................... 6

18 U.S.C. §

  24(a)(2) ............................................................................................................................. 5

  24(b) ................................................................................................................................. 5

  371 ................................................................................................................................... 4

  2704(b) ............................................................................................................................. 6

  3486 .................................................................................. ……………………….. 1, 5

  3486(a)(1) ......................................................................................................................... 5

  3486(a)(5) ............................................................................................................... 6, 8, 11

  3486(e)(1) ....................................................................................................................... 13

  3486(e)(6) ......................................................................................................................... 7

21 U.S.C. §

  301 ................................................................................................................................... 2

  331 ............................................................................................................................... 4, 5

  333(a) ............................................................................................................................... 4

42 U.S.C. § 1320d-2 ............................................................................................................. 7

47 U.S.C. § 551(h) ................................................................................................................ 6

**Rules**

Fed. R. Civ. P. 45(d)(3) ....................................................................................................... 25

**Regulations**

45 C.F.R. § 164.520 ....................................................................................................... 19, 20

**Other Authorities**

1996 U.S.C.C.A.N. 1990 ...................................................................................................... 13

H.R. CONF. REP. NO. 104-736 ............................................................................................. 13

## INTRODUCTION

When it enacted the Health Insurance Portability and Accountability Act of 1996, (HIPAA), Congress gave the Attorney General a specific tool to investigate federal healthcare offenses: administrative subpoenas under 18 U.S.C. § 3486. It also expressly set the conditions for challenging such a subpoena: only the subpoenaed party may object, and any petition must be filed before the return date specified on the subpoena. Plaintiffs here ignore both statutory commands. Plaintiffs are not the subpoenaed party, and Plaintiffs in any event bring this challenge more than three months after expiration of the deadline mandated by the statute. For those two independently sufficient reasons, Plaintiffs' challenge fails at the threshold.

But even on the merits, the motion still fails. Congress created the subpoena authority here precisely to permit access to patient records in investigations of healthcare offenses, subject to the safeguards it deemed sufficient. Indeed, Plaintiffs' arguments cannot survive the controlling authority of this Circuit. In that binding precedent, the Fourth Circuit Court of Appeals upheld a Section 3486 subpoena against the very same objections raised here. That decision is directly on point and leaves no room for Plaintiff's contrary theories. The Government routinely seeks and obtains patient records in healthcare offense investigations. There is nothing extraordinary or controversial about a Governmental subpoena issued to a healthcare provider, and Plaintiffs—strangers to the subpoena—have provided no plausible basis to effectively veto the Government's ability to investigate such offenses. The motion should be denied as procedurally improper and substantively meritless.

1

## FACTUAL AND LEGAL BACKGROUND

The United States is conducting a nationwide investigation into, among other things, whether off-label promotion and/or unlawful dispensing of puberty blockers and cross-sex hormones[1] for use by children suffering from gender dysphoria violated federal law, including the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* ("FDCA"). This investigation is of major public importance given its implications for the safety of minor patients. *See United States v. Article of Drug ... Bacto-Unidisk*, 394 U.S. 784, 798 (1969) (FDCA's "overriding purpose" is "to protect the public health" and "is to be given a liberal construction … to ensure that [drug] products marketed serve the public with 'efficacy' and 'safety'"); *see also United States v. Dotterweich*, 320 U.S. 277, 280 (1943) ("The purposes of [the FDCA] thus touch phases of the lives and health of people, which, in the circumstances of modern industrialism, are largely beyond self-protection.").

The United States Food and Drug Administration ("FDA") has not found that these drugs are safe and effective to treat gender dysphoria or any other mental disorder. Use of prescription drugs such as these for uses not approved as safe and effective (*i.e.,* off-label use) can expose patients to unproven and potentially dangerous treatments without adequate evidence of safety and effectiveness. The risks are particularly acute where, as here, the patients are children, which makes them especially vulnerable. Indeed, the Assistant Secretary for Health at the United States

---

[1] "Puberty blockers" are gonadotropin-releasing hormone agonists (GnRHa) that suppress the normal progression of puberty and are administered to pubertal children suffering from gender dysphoria and related disorders to prevent or arrest the development of their sex characteristics. Cross-sex hormones include estrogen or testosterone (which is also a Schedule III controlled substance under the Controlled Substances Act) that are administered to induce the development of secondary sexual characteristics incongruent with the child's biological sex to alter their physical and cosmetic appearance to be more like members of the opposite sex.

Department of Health and Human Services ("HHS") summarized the conclusions of the most comprehensive review to date of treatments for gender dysphoria in minors:

> Findings within this 400-page peer-reviewed report are clear. Sex-rejecting procedures such as **puberty blockers, cross-sex hormones** and surgeries for children **are dangerous**. They can cause infertility, a loss of sexual function, reduced bone density, metabolic and cognitive effects, and certainly surgical complications. They can scar kids both physically and emotionally for life, and **they do irreversible harm**.

Video produced and posted by U.S. Dep't of Health & Human Servs. (@HHSGov), X, *Protecting our children's health—and their future—is good medicine. It's also our moral obligation. Welcome to the @usphscc and the HHS team, @ADM_Christine. In Officio Salutis!* (Nov. 20, 2025, at 4:28 p.m. ET), https://x.com/HHSGov/status/1991619805598908845 (reposted from ADM Brian Christine, M.D., @ADM_Christine) (emphasis added).

With regard to the particular drugs at issue in this investigation, the danger is especially acute. As the comprehensive, peer-reviewed November 2025 HHS report explains:

> [I]n studies, PBs [puberty blockers] are followed by cross-sex hormones (CSH) over 90% of the time; this de facto combination therapy introduces new and potentially serious risks (e.g., concerning fertility) and has never been subjected to any FDA-regulated clinical trial for any population. Further, research shows that when the evidence supporting a particular off-label use is of very low certainty—as is the case for PMT [pediatric medical transition]—the already elevated risk of adverse effects associated with off-label use is increased even further.

U.S. DEP'T OF HEALTH & HUMAN SERVS., TREATMENT FOR PEDIATRIC GENDER DYSPHORIA: REVIEW OF EVIDENCE AND BEST PRACTICES 102 (Nov. 19, 2025) ("HHS REVIEW"). Although off-label prescribing itself is a generally permitted practice under federal law, "[t]he unfavorable risk/benefit profile distinguishes PMT from many other off-label uses of drugs and medical devices." *Id.* at 231.

Moreover, the widespread off-label use of these powerful drugs also undermines the regulatory system that Congress established to ensure that drugs are used consistent with sound scientific data. *See Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 619 (1973) (noting that legislative history for portions of FDCA "show a marked concern that impressions or beliefs of physicians [regarding a drug's efficacy], no matter how fervently held, are treacherous"). The FDCA rests on the premise that safety and efficacy must be demonstrated through rigorous, publicly accountable testing, rather than assumed based on clinical theory or intuition, or shaped by advocacy-driven ideology unrelated to scientific rigor. *Cf.* HHS REVIEW, at 210–217 (finding that appearance of broad medical consensus was largely manufactured through reliance on small committees aligned with advocacy-based organizations such as World Professional Association for Transgender Health (WPATH) and marked by suppression of dissenting views and discouragement of scientific debate).

The FDCA enumerates many different prohibited acts relating to drugs. Importantly, the statute prohibits not only engaging in certain prohibited acts but also the "causing thereof." 21 U.S.C. § 331. Similarly, an agreement amongst more than one person to do an act that violates the FDCA is also punishable as a conspiracy. 18 U.S.C. § 371. Violations of the FDCA are punishable as strict liability misdemeanors and are felonies if done with the intent to defraud or mislead. 21 U.S.C. § 333(a). The Declaration of Lisa K. Hsiao, the Director of the Department of Justice's ("DOJ") Enforcement & Affirmative Litigation Branch (attached hereto, "Hsiao Declaration") further explains the relevant FDCA violations implicated by the Government's investigation. *See* Hsiao Decl., Ex. A.

On July 3, 2025, under a delegation of authority from the Attorney General of the United States, Assistant Attorney General Brett A. Shumate caused the DOJ to issue a subpoena upon

Children's National Medical Center ("CNMC") in Washington, D.C. The subpoena—a product of the Attorney General's statutory authority to issue subpoenas requiring "the production of any records or other things relevant to [any] investigation" of a "Federal health care offense" 18 U.S.C. § 3486(a)(1)[2]—is part of an investigation (described in the Hsiao Declaration) of potential violations of the FDCA associated with puberty blockers and cross-sex hormones. The authorizing statute was enacted as part of HIPAA, and as a result, subpoenas issued under that authority are colloquially known as "HIPAA subpoenas." The Hsiao Declaration further explains how the documents demanded by the subpoena are relevant to the Government's investigation of potential FDCA violations, which are Federal health care offenses. *See* Ex. A. at ¶¶ 36–40. The subpoena was served upon CNMC on or about July 14, 2025, and specified a reasonable return date of August 7, 2025. Aside from the instant action, there has been no legal challenge to the subpoena.

## ARGUMENT

### I.  Plaintiffs lack standing under 18 U.S.C. § 3486 to challenge the subpoena.

Plaintiffs have a threshold problem that—on its own—requires the denial of their motion and dismissal of the action. Congress specifically limited who may challenge a HIPAA subpoena issued under Section 3486. The statute provides precise direction: "At any time **before the return**

---

[2]  A "Federal health care offense" is defined by Section 24(a) of Title 18 as, *inter alia*, "a violation of, or a criminal conspiracy to violate … section 301 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 331) … if the violation or conspiracy relates to a health care benefit program." 18 U.S.C. § 24(a)(2). The statute further defines "health care benefit program" to mean "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract." 18 U.S.C. § 24(b). Thus, Congress authorized DOJ to issue Section 3486 subpoenas like the one here to investigate violations of the FDCA, as well as conspiracies to violate the FDCA, if the violation or conspiracy relates to products or services that might ultimately be paid for by any type of health insurance plan—whether public or private.

*date* specified in the summons, ***the person or entity summoned*** may, in the United States district court for the district in which that person or entity does business or resides, petition for an order modifying or setting aside the summons[.]" 18 U.S.C. § 3486(a)(5) (emphasis added). By the statute's plain terms, **only** "the person or entity summoned" may move to quash or modify the subpoena. Here, the "entity summoned" is CNMC. Plaintiffs—CNMC patients and their parents—are not the subpoenaed entity. They therefore fall outside the statute's express grant of authority to sue, and their motion should therefore be denied out of hand.

If Congress intended to grant standing to patients to challenge a HIPAA subpoena for their records, it would have done so. In other statutes authorizing investigative demands, Congress has expressly granted notice and standing to third parties whose records are sought. For example, the Right to Financial Privacy Act ("RFPA") requires notice to a customer whose financial records are sought and expressly provides that such customers may challenge a subpoena calling for disclosure of their records. *See* 12 U.S.C. § 3410; *see also* 18 U.S.C. § 2704(b) (expressly authorizing customer/subscriber challenges as part of Stored Communications Act); *cf.* 47 U.S.C. § 551(h) (providing that governmental entity can obtain personally identifiable information from cable television service providers through court order only after cable subscriber has opportunity to appear and contest claim). And notably, courts have properly held under RFPA that *only* "customers" have standing to challenge a subpoena—corporations and other third-parties falling outside the statute's definition of "customer" do not. *See Mackey v. SEC*, No. 3:96MC407, 1997 WL 114801, at *1–2 (D. Conn. Feb. 21, 1997).

That logic straightforwardly applies here. Section 3486 allows only "the person or entity summoned" to challenge a subpoena. This construction is confirmed by other aspects of the statute, including that § 3486 imposes no notice requirement on the Government or the entity

summoned to inform patients or other individuals whose records might be implicated. Congress's choice to expressly and exclusively permit HIPAA subpoena recipients to bring challenges must therefore be read to exclude others from doing so. *See Esteras v. United States*, 606 U.S. 185, 195 (2025) (applying *expressio unius est exclusio alterius*, the "well-established canon of statutory interpretation" that provides "expressing one item of [an] associated group or series excludes another left unmentioned" (alteration in the original) (quotation omitted)).

This point is underscored by other provisions of HIPAA that demonstrate Congress recognized potential impact on patients. Indeed, Congress spoke directly to patient privacy interests and expressly required the Government to adopt rules and regulations to protect those interests. For instance, in Section 264 of HIPAA (codified as a note to 42 U.S.C. § 1320d-2), Congress directed the Secretary of HHS to develop recommendations for protecting the privacy of "individually identifiable health information," and if Congress failed to act, to promulgate regulations on its own. Pub. L. No. 104-191, § 264 (1996). Congress also deliberately chose to channel enforcement of those patient privacy protections through regulations and administrative oversight, not private suits by patients.[3] Congress passed Section 264 at the same time as the subpoena provision, which itself expressly authorized nondisclosure orders that could prevent patients from even learning of the subpoena. *See* 18 U.S.C. § 3486(e)(6).[4] The legislative

---

[3]  *See, e.g., Payne v. Taslimi*, 998 F.3d 648, 660 (4th Cir. 2021) ("HIPAA does not expressly allow for a private cause of action but delegates enforcement authority to the Secretary of the Department of Health and Human Services, reflecting Congress's intent to forgo creating a private remedy.").

[4]  The fact that Section 3486(e)(6) authorizes the Government to obtain a nondisclosure order barring the recipient from disclosing the subpoena's existence further demonstrates that Congress did not intend to grant third parties standing to challenge a HIPAA subpoena. A party obviously cannot challenge a subpoena of which it is wholly unaware. Instead, as Congress has done in the other statutes discussed above, it would have at least required notice to patients. Congress's opposite choice here confirms that strangers to the subpoena are not intended to be able to challenge the subpoena. As discussed, *infra*, Section 3486's limitations on the use of patient data also demonstrate that any protections Congress intended to provide are already included in the statute.

branch's choice to address patient privacy in one HIPAA provision while simultaneously excluding patients from any role in challenging Section 3486 subpoenas confirms that Congress deliberately deprived them of standing to challenge a HIPAA subpoena unless they themselves are the "person or entity summoned."

That choice makes sense. HIPAA subpoenas are investigative tools that are specifically designed to obtain patient and billing records so that the Government can gather evidence to determine whether (or not) a federal offense relating to the healthcare products or services a patient received has been committed. It is not uncommon for a federal healthcare offense investigation to require the collection of tens of thousands of patient records for review and analysis. *See, e.g., In re Subpoena Duces Tecum*, 228 F.3d 341, 350–51 (4th Cir. 2000) (upholding HIPAA subpoena to physician for patient records and noting that if physician treated 15,000 patients, suspicion of fraud would justify reviewing all 15,000 patient records). If every patient mentioned in responsive records could move to quash a HIPAA subpoena, the statute's enforcement scheme would collapse under the weight of collateral third-party litigation. That is not the careful scheme that Congress designed, which expressly and exclusively requires HIPAA subpoena challenges to be brought by "the person or entity summoned." 18 U.S.C. § 3486(a)(5).

Ignoring the statute's clear mandate, Plaintiffs claim that disclosure of their identities and medical records to law enforcement "constitutes a concrete and imminent injury traceable to the subpoena" thereby conferring standing upon them. ECF 1-1 at 15–16 n.59. None of the cases Plaintiffs cite for their argument (which they reduce to a footnote) arose within the controlling framework of Section 3486, and none stand for the proposition that they have a constitutional right to prevent disclosure of medical records to the Government during a criminal investigation. Indeed, the controlling precedent of this Circuit enforced a HIPAA subpoena for medical records,

holding that such disclosure "is not 'meaningfully distinguishable from a host of other unpleasant invasions of privacy that are associated with many facets of health care.'" *In Re Subpoena Duces Tecum*, 228 F.3d at 351 (quoting *Whalen v. Roe*, 429 U.S. 589, 602 (1977)).

Plaintiffs' reliance on *In re: Grand Jury 2021 Subpoenas*, 87 F.4th 229 (4th Cir. 2023) and *United States v. Idema*, 118 F. App'x 740 (4th Cir. 2005) to support their claim of standing is misplaced—and not merely because neither case involved a HIPAA subpoena with an express, statute-specific standing limitation. The standing found in *Grand Jury 2021 Subpoenas* turned on a narrow and exceptional circumstance: the subpoena directed to an attorney arguably "almost assuredly implicate[d] at least some [attorney-client] privileged materials [and] privilege interests." 87 F.4th at 249. There are no such federal privilege issues at play here. *See Whalen*, 429 U.S. at 602 n.28 ("The physician-patient evidentiary privilege is unknown to the common law."). And the Court of Appeals held in *Idema* that the third party lacked standing to challenge the government's subpoenas because he failed to demonstrate a "personal right or privilege in the information sought by the subpoena." 118 F. App'x at 744. Like *Idema*, here the Plaintiffs have no privilege or ownership interest in the subpoenaed records. The medical records question are the property of CNMC, and Plaintiffs do not contend otherwise. Because Plaintiffs have neither a property interest nor a recognized privilege in the documents, they cannot transform their privacy interests into third-party standing.

Lacking any cognizable basis for standing, Plaintiffs elevate their claim to one of constitutional significance—asserting that the subpoena unconstitutionally intrudes on their right to "informational privacy," and therefore that automatically entitles them to judicial review notwithstanding HIPAA's limitations on who may sue. ECF 1-1 at 15–16 n.59. If Plaintiffs' theory of standing were correct, anyone whose name appeared in a record could halt a federal

investigation simply by invoking an amorphous privacy interest.[5] Such a rule would also effectively nullify Congress's explicit limitation on standing in Section 3486(a)(5).

## II.    Sovereign immunity principles independently foreclose Plaintiffs' action.

Because Plaintiffs—strangers to the subpoena—have brought an independent action to quash that subpoena, this action is in substance a suit against the United States that seeks to restrain the Government's investigatory powers. Under settled law, however, such suits are barred absent an express waiver of sovereign immunity. *See FDIC v. Meyer*, 510 U.S. 471, 475 (1994) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."). "[A]ny waiver must be unequivocally expressed in a statutory provision and strictly construed in favor of the United States." *Bullock v. Napolitano*, 666 F.3d 281, 283 (4th Cir. 2012). "[T]he terms of the United States' consent to be sued … define [a] court's jurisdiction to entertain the suit." *Osmon v. United States*, 66 F.4th 144, 147 (4th Cir. 2023) (quoting *Meyer*, 510 U.S. at 475). "[S]overeign immunity deprives federal courts of jurisdiction to hear claims, and a court finding that a party is entitled to sovereign immunity must dismiss the action for lack

---

[5] The Supreme Court has repeatedly refused to unequivocally endorse a constitutional right to "informational privacy" and has instead only assumed its existence arguendo while *upholding* the government's access to personal information. *See NASA v. Nelson*, 562 U.S. 134, 138, 147 (2011) (citing *Whalen*, 429 U.S. at 599); *see also id.* at 160 (Scalia, J., concurring) ("A federal constitutional right to 'informational privacy' does not exist."). The circuits appear split on the question. *See Am. Fed'n of Gov't Emps., AFL-CIO v. HUD*, 118 F.3d 786, 791 (D.C. Cir. 1997) (expressing "grave doubts as to the existence of a constitutional right of privacy in the nondisclosure of personal information"); *Lee v. City of Columbus*, 636 F.3d 245, 260–61 (6th Cir. 2011) (stating that individuals have only a limited privacy interest in medical records and disclosure of such information does not rise to level of constitutional violation). *But see Payne*, 998 F.3d at 655–56 (citing *Walls v. City of Petersburg*, 895 F.2d 188 (4th Cir. 1990) and finding constitutional privacy right exists but that prisoner did not have expectation of privacy in his HIV status). That the D.C. Circuit Court of Appeals has expressed "grave doubts" as to the constitutional theory Plaintiffs invoke may help explain why they filed in this Court rather in the District of Columbia—where the subpoena was both issued and served. Plaintiff's choice of forum appears shaped by the absence of supportive precedent in the jurisdiction where the subpoena originated and operates.

of subject-matter jurisdiction." *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 649 (4th Cir. 2018).

Absent waiver, sovereign immunity bars an action against the Government to quash a subpoena. *See Ponsford v. United States*, 771 F.2d 1305, 1309 (9th Cir. 1985); *Dorsey v. United States*, 618 F. Supp. 471, 473–74 (D. Md. 1985) (holding failure to strictly comply with statutory procedures to quash summons deprived court of jurisdiction because "any waiver of sovereign immunity requires strict compliance with statutory procedure."). Section 3486(a)(5) supplies such a waiver and procedure, but it is expressly limited to "the person or entity summoned." By authorizing *only* the recipient of the subpoena to bring a lawsuit against the United States to challenge it, Congress both defined who has standing (*see supra*) and also specified the sole context in which sovereign immunity is waived. Plaintiffs here are thus doubly barred. Permitting them to bring this challenge would require the Court to both enlarge standing and expand the Government's limited waiver of sovereign immunity beyond that which Congress authorized. To do so would also contravene the Supreme Court's command that "a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign." *Lane v. Peña*, 518 U.S. 187, 192 (1996).

### III.    Plaintiffs' motion is also time-barred.

Even if Plaintiffs had standing and even if the Government were not immune, their petition would still be independently barred as untimely. Section 3486 requires any petition to quash or modify a HIPAA subpoena to be filed "before the return date specified in the summons." 18 U.S.C. § 3486(a)(5). Courts strictly enforce statutory deadlines to move to quash a subpoena. *See Ponsford*, 771 F.2d at 1309 (strictly construing statute's 20-day limit to bring proceeding to quash IRS summons; holding statutory deadline is jurisdictional and "is a condition precedent to

the waiver of sovereign immunity"); *accord Jones v. Comm'r*, No. CIV A CCB-07-2024, 2007 WL 4302593, at *1 (D. Md. Aug. 23, 2007) ("failure to strictly comply with the procedures set forth for filing a petition to quash precludes this court from exercising its jurisdiction over the petition."); *see also Swann v. Secretary, HUD*, No. 05-492, 2006 WL 148738, at *1 (D.D.C. Jan. 19, 2006) (court lacks subject matter jurisdiction where motion challenging administrative subpoena is untimely under statute authorizing challenge); *Turner v. United States*, 881 F. Supp. 449, 451 (D. Haw. 1995) ("the government's waiver of its sovereign immunity is conditioned on the timely filing of the motion to quash.").

Here, Plaintiffs filed this action on November 17, 2025, more than three months after the return date specified on the subpoena: August 7, 2025.[6] As a result, they cannot invoke the statute's limited mechanism to challenge the subpoena—and this Court lacks jurisdiction to even hear such a challenge—assuming the Plaintiffs could otherwise satisfy the statute's standing requirement. Again, this scheme makes sense. Congress coupled the subpoena authority in Section 3486 with a firm deadline: any motion to quash must be filed before the return date. That bright line was no accident. To excuse the motion's tardiness would convert a clear statutory command into an open invitation for endless obstruction—paralyzing large-scale healthcare offense investigations by patient challenges brought at will. That is not the law.

---

[6] Plaintiffs cannot contend that they should be excused from complying with Section 3486(a)(5)'s clear requirement that any petition to quash be filed "before the return date specified in the summons" on the theory that, as non-summoned parties, they were unaware of the subpoena. Plaintiffs' own memorandum acknowledges that the Attorney General announced the existence of subpoenas in this investigation on July 9, 2025, two days after the Assistant Attorney General issued the subpoena to CNMC. *See* ECF 1-1 at 5 & n.15. Counsel for Plaintiffs did not seek confirmation from the Government that CNMC received such a subpoena until November 14—three days before filing this action. *See* Aff. of Eve L. Hill, ECF 1-15 at ¶ 20. Plaintiffs certainly had notice of the possibility that CNMC received such a subpoena and could have attempted to contact the Government long before they did, had they wished to do so. Section 3486 contains no tolling provision for untimely challenges by third-parties who were aware that subpoenas existed yet declined to act before the statutory deadline.

**IV.    Congress anticipated and authorized subpoenas to obtain patient records.**

One of the key purposes of HIPAA is to "combat waste, fraud, and abuse in health insurance and health care delivery." HIPAA, Pub. L. 104-191, 110 Stat 1936 (1996). The legislative history of the statute confirms that Section 3486 was enacted to "establish procedures for the Attorney General to make investigative demands" for "**health information about an individual**" in health care offense investigations. H.R. Conf. Rep. No. 104-736, at 261 (1996), *reprinted in* 1996 U.S.C.C.A.N. 1990, 2074 (emphasis added). Congress thus anticipated and authorized the Government's access to the very sorts of patient and billing records that Plaintiffs seek to shield.

That is why, in the same statutory section, Congress added specific protections governing the use of that information once produced. Section 3486(e) provides that generally, "[h]ealth information about an individual that is disclosed under this section may not be used in, or disclosed to any person for use in, any administrative, civil, or criminal action or investigation directed against the individual who is the subject of the information." 18 U.S.C. § 3486(e)(1). By enacting these safeguards, Congress made clear that HIPAA subpoenas would inevitably reach patient-identifying records—yet it chose not to carve out an exception simply because the records might be highly personal. If subpoenas under Section 3486 could not reach records about mental health, sexual health, or other sensitive topics, then fraud and abuse schemes exploiting those very areas would be insulated from investigation—exactly the opposite of what Congress set out to prevent in enacting the statute. Congress did not overlook the sensitivity of these records. To quash the subpoena here on that basis would be to impermissibly override a legislative judgment, *see Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012) (explaining that courts are "vested with the authority to interpret the law" and possess "neither

the expertise nor the prerogative to make policy judgments"), and effectively immunize certain

corners of the health care system.

V.    **The subpoena satisfies the Fourth Amendment because it properly seeks evidence of adulterated, misbranded, and unapproved new drug violations of the FDCA.**

Even if (1) the Plaintiffs had standing and (2) this Court had jurisdiction to hear this

untimely challenge, the subpoena meets the applicable reasonableness standards under binding

Fourth Circuit law:

> In short, an investigative subpoena, to be reasonable under the Fourth Amendment, must be (1) authorized for a legitimate governmental purpose; (2) limited in scope to reasonably relate to and further its purpose; (3) sufficiently specific so that a lack of specificity does not render compliance unreasonably burdensome; and (4) not overly broad for the purposes of the inquiry as to be oppressive, a requirement that may support a motion to quash a subpoena only if the movant has first sought reasonable conditions from the government to ameliorate the subpoena's breadth.

*In re Subpoena Duces Tecum*, 228 F.3d at 349. Plaintiffs challenge only the first two elements,

claiming that the subpoena lacks a legitimate purpose and that it is not sufficiently limited in

scope for its purpose. *See* ECF 1-1 at 16–21. Neither contention has merit.

A.    *The subpoena properly seeks evidence of adulterated, misbranded, and unapproved new drug violations of the FDCA.*

Plaintiffs are both wrong and lack any basis to assert that the subpoena was issued for an

improper purpose or in "bad faith." ECF 1-1 at 17–20. Director Hsiao's Declaration sets out facts

that squarely refute their allegations and confirm the subpoena's legitimate purpose. *See*

*generally* Hsiao Decl. Courts have placed a heavy burden on challengers alleging that a

subpoena was issued in bad faith. *See, e.g., United States v. LaSalle Nat'l Bank*, 437 U.S. 298,

316 (1978); *Smith v. United States*, 289 F.3d 843, 846–47 (6th Cir. 2001) (rejecting physician's

attempt to quash HIPAA subpoena for "complete patient files" against claim of improper purpose

14

because physician failed to "bear[] 'heavy' burden of proving bad faith" in issuing subpoena (quoting *LaSalle*, 437 U.S. at 316)); *see also United States v. Whispering Oaks Residential Care Facility, LLC*, 673 F.3d 813, 817 (8th Cir. 2012) (HIPAA subpoena "respondent bears a heavy burden to disprove the existence of a valid purpose for an administrative subpoena.").

Plaintiffs cannot carry their burden. To the contrary, the subpoena here was issued squarely within the bounds of Section 3486, which expressly authorizes the Attorney General to issue subpoenas in investigations of "Federal health care offense[s]," including violations of the FDCA that involve a health care benefit program. As Director Hsiao's declaration makes clear, that is precisely the purpose the subpoena serves here.

Director Hsiao's declaration further sets forth in detail how the subpoenaed records are directly relevant to the Government's ongoing nationwide investigation into possible violations of the FDCA. The investigation concerns the distribution, promotion, and sale of puberty blockers and cross-sex hormones in minors for the treatment of gender dysphoria—uses that the FDA has never approved and that raise grave safety concerns as explained in the HHS REVIEW. Such inquiries fall squarely within the Government's statutory mandate to protect the public from misbranded, adulterated, and unapproved drugs. *See Dotterweich*, 320 U.S. at 285 (FDCA protects the "innocent public who are wholly helpless" to protect themselves from such products).

Plaintiffs claim that "animus toward transgender individuals" is the "explicit and official policy" of the United States, thereby tainting the investigation into violations of federal law associated with commercial pharmaceutical products introduced into commerce with the unapproved intended use of treating children diagnosed with gender dysphoria. ECF 1-1 at 17–18. But that confuses political rhetoric with legal authority. *Cf. Trump v. Hawaii*, 585 U.S. 667,

701–02 (2018). What matters is whether the subpoena is tethered to a proper statutory inquiry. Here, it plainly is, as the Hsiao Declaration makes clear. The subpoena was issued to CNMC to aid in a determination as to whether the hospital, its staff, and affiliates are violating the FDCA—either directly or through a conspiracy with others (*e.g.,* with pharmacies, drug manufacturers, and/or distributors)—with the intent to defraud and mislead. It also seeks information to assist in whether other third parties might be doing so (independent of the hospital). Whether the President has a policy goal of ending gender-related pharmaceutical and surgical treatment of minors—a goal that the Supreme Court has recognized is rational, *see United States v. Skrmetti*, 145 S. Ct. 1816, 1835–36 (2025)—is not relevant to determining whether the investigation itself is lawful.

This is especially true against the backdrop of the presumption of regularity that attaches to the actions of federal prosecutors "as the President's delegates to help him discharge his constitutional responsibility to 'take Care that the Laws be faithfully executed.'" *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting U.S. CONST. art. II, § 3); *see, e.g.*, *United States v. Chem. Found.*, 272 U.S. 1, 14–15 (1926) ("The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."). The fact that the President (or other executive branch leaders) have expressed opposition to gender-related sex trait modification treatments in minors does not convert a facially valid investigation into bad faith. If it did, nearly every enforcement effort in controversial areas would collapse under accusations of "animus" and would provide nearly anyone with a veto of HIPAA subpoenas by invoking political controversy.

Moreover, Plaintiffs conflate criticism of medical practices for modification of sex traits with hostility toward the people who receive them. There is a distinction between animus toward a group of people—a desire to harm a class of persons—and regulatory scrutiny of the interstate distribution of drugs to treat disorders for which they have not been found safe or effective. The Government is entitled to hold, articulate, and act upon policy judgments and viewpoints about a treatment modality or medical ideology involving federally-regulated drugs—including their distribution, labeling, marketing, sale, and insurance reimbursement—without it equating to animus toward a group of patients or encroaching on state regulation of medical practice. Plaintiffs' attempt to attribute political rhetoric to the specific intent of the issuing officials is not the "clear evidence" necessary to overcome the presumption of regularity owed to the federal investigative process. *Chem. Found.*, 272 U.S. 1 at 14.

In short, Plaintiffs cannot meet their "heavy burden" of proving improper purpose. The record demonstrates that this subpoena was issued pursuant to clear statutory authority, in furtherance of an ongoing nationwide investigation into possible violations of the FDCA, and supported by a declaration from a senior DOJ official. This Court has before it direct evidence of proper purpose. That evidence compels denial of Plaintiffs' motion.

## VI. Plaintiffs' Fifth Amendment privacy claim collapses under the Fourth Circuit's controlling law.

Plaintiffs correctly identify the two-part test used in this Circuit to determine the scope of constitutional privacy rights. That test asks first whether there is a reasonable expectation of privacy in the information sought, and second whether "a compelling governmental interest in disclosure outweighs the individual's privacy interest." *Payne*, 998 F.3d at 656 (quoting *Walls v. City of Petersburg*, 895 F.2d 188, 193 (4th Cir. 1990)) (internal quotation marks omitted). On the second factor, Plaintiffs' argument rests almost entirely on a seven-factor balancing test from the

Third Circuit, *United States v. Westinghouse Electric Corporation*, 638 F.2d 570 (3d Cir. 1980)—
decided more than fifteen years *before* Congress enacted HIPAA. But the Fourth Circuit Court of
Appeals did **not** apply that multi-factor test (even though the district court did) when confronted
with an almost identical Section 3486 subpoena challenge (decided a decade after *Walls*).
*Compare In re Subpoenas Duces Tecum*, 51 F. Supp. 2d 726, 738–39 (W.D. Va. 1999) *with In re
Subpoena Duces Tecum*, 228 F.3d at 351.

Under the controlling standard the Fourth Circuit established in *In re Subpoena Duces
Tecum*—not *Westinghouse*—Plaintiffs' privacy claim fails for two reasons. First, their
expectations of privacy are greatly diminished both by the realities of modern medical practice
and by CNMC's own explicit admonition to its patients of the very disclosures at issue here.
Second, even assuming some privacy interest remains, the Fourth Circuit has already held—in
the context of a HIPAA subpoena seeking medical records for the purpose of investigating health
care offenses—that the Government's "compelling interest in identifying illegal activity and
deterring future misconduct … outweighs the privacy rights of those whose records were turned
over to the government, particularly in light of the limitation placed on uses of the subpoenaed
information by § 3486." *In re Subpoena Duces Tecum*, 228 F.3d at 351.

### A. Plaintiffs' asserted privacy expectations are contrary to modern medical practice and the explicit disclosures in CNMC's Notice of Privacy Practices.

While the United States acknowledges that the information contained in patient records are
sensitive, Plaintiffs' claimed expectation of privacy is incompatible with both the functional
realities of modern medical practice and the disclosures that CNMC provides to patients and
their families. *See* CHILDREN'S NAT'L HOSP., NOTICE OF PRIVACY PRACTICES (Jan. 31, 2020),
https://perma.cc/URE5-D4AZ (last visited Dec. 8, 2025) ("CNMC NPP") (Attached hereto as an
Exhibit). Indeed, in the controlling case in this Circuit, the Court of Appeals explicitly

18

recognized that "patients have a reduced expectation of privacy in patient records because nearly every patient has agreed pursuant to their insurance policies and releases to allow their medical records to be reviewed." *In re Subpoena Duces Tecum*, 228 F.3d at 351.

To put a finer point on it, patient medical records are not maintained in isolation. The delivery of health care today requires the routine disclosure of personal health information through a network of clinicians, laboratories, pharmacies, quality assurance and utilization reviewers, insurers, billing intermediaries, third-party administrators, accreditation bodies, and regulators. That is just the reality of modern health care—patient medical information is routinely shared across multiple third parties. Each of these entities access parts (or all) of a patient's record as a routine feature of delivering and financing medical care. For example, insurers often require detailed clinical documentation before paying claims; administrative staff and billing personnel routinely handle and access patient charts; and third-party laboratories and pharmacies likewise often receive detailed information contained in patient charts. But information is also routinely shared, as is requested here, for regulatory compliance and public health monitoring. Patients understand this reality not only because it is reflected in ordinary interactions with their physicians, office staff, and insurers, but also because that understanding is formalized through a federally-required Notice of Privacy Practices given to each patient by the health care provider. *See* 45 C.F.R. § 164.520 (generally requiring that insurance companies and health care providers provide notice to individuals about how entity may use and disclose protected health information about individual).

CNMC explicitly informs patients and their families that their personal health information will be disclosed for all sorts of reasons not directly associated with their individual medical care. Among other things, personal health information will be used for "quality assessment and

improvement," "training and evaluation," and "licensing and accreditation activities." CNMC NPP at 4. In addition, "business associates" will use this information in performing administrative functions for CNMC. *Id.* The hospital informs patients that their information will be transmitted through "Health Information Exchanges," making it accessible to a broad range of outside providers and entities, and that "certain information may remain accessible" to outsiders even if a patient opts out of the exchange. *Id* at 4–5.

And, critically, CNMC explicitly informs each and every patient and their family that the hospital may disclose their personal health information to **health oversight agencies, public health authorities, law enforcement officials, and in response to subpoenas or to "prevent criminal activity including fraud."** *Id.* at 4–6 (emphasis added). CNMC specifically notifies every patient that these disclosures may occur in the context of "audits, **investigations**, inspections, and licensure. **These activities are necessary for the government to monitor Children's National activities**, government programs and compliance with civil rights and other laws." *Id*. at 6 (emphasis added).

These disclosures, which CNMC patients receive as part of their care, foreclose any reasonable belief that their medical information would remain inaccessible to government authorities acting through lawful investigative mechanisms. They knew, and were expressly told, that their medical information would be used and disclosed precisely in the manner they now assert infringes their privacy interests. In this context, the notion that their medical information would remain shielded from a lawful federal subpoena is unsustainable.

**B.  The Fourth Circuit's decision in In Re Subpoena Duces Tecum *dictates the result in this Circuit—not* Westinghouse*—and it confirms the subpoena's validity.***

Even if Plaintiffs had a reasonable expectation of privacy that would protect them from disclosure to the government as part of an investigation into health care offenses (as opposed to the public at large)[7] in their medical records under these circumstances, the subpoena remains valid and enforceable. Plaintiffs rely on the Third Circuit's 1980 *Westinghouse* decision, which created a seven-factor balancing test for evaluating privacy considerations when the government seeks disclosure of sensitive information. *See* 638 F.2d at 578. Even if that test were the rule in the Fourth Circuit—which it is not—Plaintiffs' reliance on it would still be misplaced. *Westinghouse* involved a different statute, and it predated HIPAA by more than fifteen years. When Congress enacted HIPAA in 1996, it directly confronted the privacy concerns that animated *Westinghouse*, addressing concerns about unauthorized disclosures of health information while simultaneously creating a specific subpoena authority for the Attorney General to investigate federal health care offenses. *See United States v. Elliott*, 676 F. Supp. 2d 431, 436 (D. Md. 2009) (HIPAA "is the primary federal law which was passed to ensure an individual's right to privacy over medical records."). In doing so, Congress itself performed the balancing that *Westinghouse* envisioned and provided a constitutionally-compliant subpoena power to

---

[7]  The Fourth Circuit has "held that to the extent such a [privacy] right might exist, it is not implicated when 'the possibility of public disclosure is … remote' … And 'to the extent that avoidance of embarrassment has a constitutional dimension in [the medical records] context, it only involves the embarrassment and humiliation that might follow public disclosure' of the individual's health information." *Bryant v. City of Norfolk*, No. 2:20CV26, 2020 WL 14038704, at *7 (E.D. Va. Aug. 7, 2020) (quoting *Watson v. Lowcountry Red Cross*, 974 F.2d 482, 487–88 (4th Cir. 1992) (citation modified)). The United States is prepared to collaborate with Plaintiffs in crafting a reasonable protective order to further safeguard against the risk of public disclosure of the records sought here, notwithstanding Departmental and statutory safeguards already in place. *See generally* Federal Privacy Act of 1974, 5 U.S.C. § 552a (preventing federal agencies from disclosing such records absent specific, enumerated circumstances).

obtain the same medical records that the statute protects, thus abrogating the need for a court-fashioned, multi-factor balancing test.

Precedent confirms as much. Like this case, the controlling Fourth Circuit precedent, *In re Subpoena Duces Tecum*, involved a set of HIPAA subpoenas issued under Section 3486 to a health care provider during an investigation into federal health care offenses. 228 F.3d at 344. The subpoenas there—similar to the one at issue here—required production of "all patient records and documentation concerning patients whose services were billed to [certain government health care benefit plans] including complete medical files, patient billing records, [etc.]." *Id.* The physician challenged the subpoenas on Fourth Amendment and privacy grounds, arguing that the subpoenas "violated [the] privacy rights" of his patients. *Id.* at 345. The Fourth Circuit first held that the subpoenas were reasonable under the Fourth Amendment, and then squarely rejected the privacy challenge, concluding that the "government has a compelling interest in identifying illegal activity and in deterring future misconduct. And this interest outweighs the privacy rights of those whose records were turned over to the government, particularly in light of the limitation placed on uses of subpoenaed information by § 3486." *Id.* at 351. Notably, the Court of Appeals underscored that patients retain only a "reduced expectation of privacy in patient records" arising from patients' insurance-related disclosures: "We agree with the government that any disclosure of information in the files of [the medical provider's] patients is not 'meaningfully distinguishable from a host of other unpleasant invasions of privacy that are associated with many facets of health care.'" *Id.* (quoting *Whalen*, 429 U.S. at 602).

Under that controlling precedent, the outcome here is straightforward: the subpoena should be enforced because the Government's compelling interest outweighs any limited privacy interests of the Plaintiffs. This investigation into federal health care offenses involves carrying

out the FDCA's "overriding purpose to protect the public health," *Bacto-Unidisk*, 394 U.S. at 798, and safeguarding "the innocent public who are wholly helpless," *Dotterweich*, 320 U.S. at 285, to protect themselves from dangerous or fraudulent "products which may affect the health of consumers." *United States v. Park*, 421 U.S. 658, 673 (1975).

As detailed in the Hsiao Declaration, the United States is conducting a significant, nation-wide investigation involving potential violations of the FDCA as they relate to puberty blockers and cross-sex hormones when used in the treatment of gender dysphoria and related disorders in minors. Director Hsiao explains in her declaration precisely how and why each category of information the subpoena seeks is relevant and necessary to further the Government's investigation, including how physician prescribing practices are relevant. The requested records bear directly on whether the practices surrounding distribution, promotion, and sale of these drugs—unproven as safe or effective for treating gender dysphoria or any other mental disorder—may be violating federal law and endangering children. *See generally* Hsiao Decl. This off-label use of these powerful drugs may be putting children at significant risk, leaving lifelong mental and physical side effects and consequences—the full extent of which may yet be unknown. *See id.* at ¶¶ 21–29.

The public—through its government—has an overwhelming interest in ensuring that the drugs they take into their bodies are both safe and effective for their intended uses. And of course, this interest is only heightened with minor children, who are uniquely vulnerable to long-term, potentially irreversible physical and mental harm from unproven treatments. *See New York v. Ferber*, 458 U.S. 747, 756 (1982) ("It is evident beyond the need for elaboration that a State's interest in safeguarding the physical and psychological well-being of a minor is compelling."); *Prince v. Massachusetts*, 321 U.S. 158, 165 (1944) (noting society's interest in protecting welfare

of youth); *see also Maryland v. Craig*, 497 U.S. 836, 852–53 (1990) (concluding that Government's interest in physical and psychological well-being of child-abuse victims can outweigh Sixth Amendment constitutional right to confront accuser).

The Government's interest in investigating health care offenses directly affecting the health and safety of children and adolescents, and the public's interest in protection against unproven and risky treatments outweighs, as a matter of law, any individual's privacy interest in medical records. To rule otherwise would be to hold that the Constitution strips the Government of its power to protect children from victimization—an absurd result that cannot be permitted.

The Fourth Circuit Court of Appeals has already told district courts exactly how to resolve the issue that Plaintiffs present: in *In re Subpoena Duces Tecum*, it upheld Section 3486 investigative subpoenas for patient medical records over the same sort of privacy objections, concluding that the Government's interest "outweighs the privacy rights" of the patients. 228 F.3d at 351. The same holding necessarily applies here, foreclosing Plaintiff's privacy challenge.

## VII.    Any relief should be confined to the named Plaintiffs here and limited to modification of the subpoena.

Should the Court grant any part of Plaintiffs' motion, any order should be limited to the records of these specific individuals. Absent a class action, relief in federal court is confined to the parties actually before it. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348, (2011). It follows that "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018) (quotation omitted). To conclude otherwise would be to flout bedrock limitations on third-party standing and, more fundamentally, the power of the courts. *Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("[T]he plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."). The Supreme Court's cases on injunctive relief prove the point. *See, e.g.*, *Trump v.*

*CASA, Inc.*, 606 U.S. 831, 852 (2025) ("the question is not whether an injunction offers complete relief to everyone potentially affected by an allegedly unlawful act; it is whether an injunction will offer complete relief to the plaintiffs before the court."); *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs before the court."). Although a quashal is not an injunction in the technical sense, Plaintiffs provide no authority for the proposition that it is free from the above limitations on the judicial power. Accordingly, any relief should extend only to the named Plaintiffs, not to non-parties.

Along with limiting any relief to the named Plaintiffs, the Court should not quash the subpoena. Instead, the Court should modify the subpoena to require the production of anonymized patient records. *Cf.* Fed. R. Civ. P. 45(d)(3) (allowing court to quash or modify subpoena). This remedy would answer Plaintiffs' privacy concerns while allowing the government's investigation to proceed. *See U.S. ex rel. Roberts v. QHG of Indiana, Inc.*, No. 1:97-CV-174, 1998 WL 1756728, at *8 (N.D. Ind. Oct. 8, 1998) ("[T]he privacy interests of a patient in his or her medical records is tied to identity information contained in the records. Once the identifying information is removed from the record, the patient's privacy interest is essentially eliminated." (citation omitted)); *M.J. v. District of Columbia*, No. 118CV01901EGSGMH, 2020 WL 13668559, at *8 (D.D.C. July 1, 2020) (same); *cf. Matter of Search of Info. that is Stored at Premises Controlled by Google LLC*, 579 F. Supp. 3d 62, 89 n.26 (D.D.C. 2021) ("it is likely that Google's disclosure of anonymized location information to the government at step one does not implicate significant privacy concerns.").

## CONCLUSION

Granting Plaintiffs' motion would upend the statutory scheme Congress enacted and seriously impair the Government's ability to investigate federal health care offenses. Section 3486 not only authorizes subpoenas and the statutory text fully contemplates that such subpoenas would seek patient records. The statute also confines any challenges to the subpoena recipient, requires strict compliance with a pre-return date deadline, and pairs that authority with privacy safeguards that cabin the use of the information obtained. Plaintiffs seek to disregard each of those components while asking the Court to grant them a free-floating veto over investigative subpoenas that seek medical records—a veto that the Fourth Circuit has already rejected in *In re Subpoena Duces Tecum*.

In the end, Plaintiffs' challenge fails on every level. Section 3486 does not authorize them to sue. Their petition is untimely under that statute. And sovereign immunity principles bar their legal attack. Even if those threshold defects could be ignored, the subpoena is valid. It is grounded in a legitimate and compelling investigation of potential federal health care offenses and is fully consistent with binding caselaw holding that subpoenas for medical records like the one at issue here do not violate the patients' privacy rights because the Government's compelling interests in identifying unlawful conduct outweighs patients' diminished privacy interests. Were Plaintiffs' theory adopted, any patient mentioned in a provider's records could collaterally obstruct routine health care investigations, effectively gutting Section 3486 and shielding entire domains of health care from investigatory review whenever the subject matter carries personal sensitivity or political controversy.

The Court should decline that invitation and deny the motion to quash, limiting any relief (if granted) to the individual plaintiffs before the Court.

Dated, this 15th day of December, 2025.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

JORDAN C. CAMPBELL
Deputy Assistant Attorney General

LISA K. HSIAO
Acting Director
Enforcement & Affirmative Litigation Branch

 /s/ Ross S. Goldstein
ROSS S. GOLDSTEIN (Bar No. 15700)
PATRICK R. RUNKLE
Assistant Directors

SCOTT DAHLQUIST
STEVEN R. SCOTT
Trial Attorneys

United States Department of Justice
Enforcement & Affirmative Litigation Branch
P.O. Box 386
Washington, DC 20044
Tel:  (202) 353-4218
Fax: (202) 514-8742
Ross.Goldstein@usdoj.gov